# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

ALEX HILL,

      Plaintiff,

v.

MERRICK B. GARLAND,
U. S. Attorney General,
U. S. Department of Justice,

      Defendant.

CIVIL ACTION FILE NO.
1:21-cv-05130-LMM-LTW

## MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Plaintiff Alex Hill filed the above-styled employment discrimination action against Defendant Merrick B. Garland, U. S. Attorney General, U. S. Department of Justice, on December 15, 2021. [Doc. 1]. Plaintiff Hill's Amended Complaint, which was filed on November 28, 2022, is the operative pleading in this case. [Doc. 29]. Plaintiff's remaining claims against Defendant are for race discrimination and retaliation based on Plaintiff's termination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Docs. 29, 40, 47, 51]. This case is before the court on a Motion for Summary Judgment filed by Defendant under Federal Rule of Civil Procedure 56. [Doc. 78].

## I. <u>FACTS</u>

Plaintiff Alex Hill is a black male who joined the Federal Bureau of Investigation ("FBI") in 1997 and was assigned to the FBI's Atlanta Field Office as a Special Agent ("SA") from 1997 to 2005. [Doc. 78-2, Defendant's Statement of Material Facts ("DSMF") ¶ 1]. After spending time abroad and at FBI headquarters from 2005 to 2012, Plaintiff returned to the Atlanta Field Office as a Supervisory Special Agent ("SSA") from February 2012 through December 2017, when his employment with the FBI ended. [DSMF ¶ 2].

Plaintiff Hill testified that in 2014 or 2015, he filed an Equal Employment Opportunity ("EEO") Complaint of discrimination involving race, but he did not pursue it. [Doc. 79-2, Plaintiff's Statement of Material Facts ("PSMF") ¶ 1; Pla. Dep. at 51-53].

From March 2017 until his termination in December 2017, Plaintiff reported to Matthew Alcoke, Assistant Special Agent in Charge ("ASAC") in the Atlanta Field Office. [DSMF ¶ 3]. From November 2016 until Plaintiff's termination in December 2017, David LeValley was the Special Agent in Charge ("SAC") in the Atlanta Field Office. [DSMF ¶ 4].

Plaintiff and his ex-wife finalized their divorce shortly after December 2013, but there was ongoing litigation regarding some aspects of the divorce decree and child

custody arrangements. [DSMF ¶ 5]. In a consent decree issued on November 2, 2015, the Superior Court Judge presiding over Plaintiff's child custody case ("Judge #1") had appointed a guardian ad litem ("GAL") for Plaintiff's two youngest children and ordered Plaintiff to pay $3,000 toward the cost of the GAL. [Doc. 75-1, Plaintiff's Deposition ("Pla. Dep.") at 64, 130; DSMF ¶ 6]. In February 2016, Judge #1 held a show cause hearing to address the status of Plaintiff's payment of the cost of the GAL. [DSMF ¶ 7]. When Plaintiff refused to comply with court orders, Judge #1 issued a civil contempt citation against Plaintiff and sentenced him to ten days in jail. [Pla. Dep. at 14-16, 67-68; Doc. 78-6, Exhibit D, Will Declaration ("Will Dec.") at FBI001184; DSMF ¶ 8].

After Plaintiff Hill was released from custody following his first arrest, ASAC Matthew Alcoke and SAC David LeValley met with him and inquired if he had legal counsel and how he was addressing the matter. [DSMF ¶ 10; Doc. 79-3, Plaintiff's Declaration ("Pla. Dec.") ¶ 6]. ASAC Alcoke and SAC LeValley informed Plaintiff that they had notified the Inspection Division about his arrest, reminded him that he needed to keep up with his financial obligations, and advised him to abide by court orders. [Doc. 78-4, Alcoke Declaration ("Alcoke Dec.") at FBI001179; DSMF ¶ 11].

In late March or early April 2016, Plaintiff learned he was under administrative inquiry by the Office of Professional Responsibility ("OPR") based on the February

2016 show cause hearing and his subsequent arrest and ten-day incarceration for civil contempt. [Pla. Dep. at 69-71; DSMF ¶ 12]. In September 2016, Judge #1 was ordered to recuse herself from Plaintiff's child custody case, and the case was reassigned to another Superior Court Judge ("Judge #2"). [DSMF ¶ 13].

On October 10, 2016, Plaintiff Hill filed a formal EEO Complaint of Discrimination (the "2016 EEO Complaint"). [Doc. 78-7, 2016 EEO Complaint; DSMF ¶ 14]. In the 2016 EEO Complaint, Plaintiff raised race discrimination and retaliation claims based on, *inter alia*: (1) his non-selection for an ASAC position in June 2016; (2) his transfer to a less prestigious squad in June 2016; and (3) various performance-related issues. [DSMF ¶ 15].

Following Judge #1's civil contempt finding and Plaintiff's first arrest, the matter was sent to OPR for adjudication. [DSMF ¶ 16]. OPR proposed that Plaintiff be issued a 60-day suspension and a demotion from a supervisory to a non-supervisory position. [Doc. 78-5, Plaintiff's Sworn Statement ("Pla. Statement") at FBI001167; DSMF ¶ 17].

Plaintiff appealed the OPR proposal and had an oral appeal with OPR Assistant Director Candice Will on July 11, 2017. [Pla. Statement at FBI001167-1168; DSMF ¶ 18]. Will served as the OPR Assistant Director from approximately 2004 to 2018. [PSMF ¶ 9]. Will testified that her duties included running the OPR, overseeing

4

employee disciplinary processes, responding to Congressional inquiries, responding to press inquiries that pertained to FBI misconduct matters, and counseling and advising the Director and Deputy Director when questioned. [Will Dep. at 7].

Assistant Director Will was the FBI's chief disciplinarian at the time she met with Plaintiff in July 2017, and her role was to administer the disciplinary process to all FBI employees. [DSMF ¶ 19]. In the July 2017 meeting, Will interviewed Plaintiff regarding the February 2016 show cause hearing, Judge #1's civil contempt finding, and Plaintiff's subsequent arrest and incarceration. [Pla. Dep. at 82-83; DSMF ¶ 20]. During this meeting with Will, Plaintiff and his then-attorney advised her that there would be an investigation of Judge #1 for potential corruption. [DSMF ¶ 22]. Plaintiff also stated that while meeting with Will: "I discussed the fact that I had previously filed an EEO Complaint regarding [Atlanta Field Office Executive Management's] retaliatory actions against me." [Pla. Statement at FBI001167-1168; Pla. Dep. at 104-05; PSMF ¶ 3; DSMF ¶ 22]. Defendant acknowledges that Plaintiff and his attorney notified Will of Plaintiff's 2016 EEO Complaint during the July 2017 meeting. [DSMF ¶ 22].

During the July 2017 meeting, Plaintiff's attorney raised concerns about Will and her colleagues attempting to adjudicate a personal matter and protected activities that they did not have any expertise or background in. [PSMF ¶ 4]. Plaintiff's counsel

specifically informed Will that the FBI lacked legal authority to advise Plaintiff on domestic court proceedings. [PSMF ¶ 5]. Plaintiff stated in his declaration: "My counsel specifically admonished [Assistant Director] Will that neither she nor the FBI had the legal authority to tell me how to handle domestic court proceedings, given that I was represented by counsel and the FBI lacked expertise in Georgia family law." [Pla. Dec. ¶ 16]. During the meeting, Will put Plaintiff on notice that OPR expected him to comply with court orders. [DSMF ¶ 21].

On July 17, 2017, about six days after the meeting between Assistant Director Candace Will and Plaintiff, Will amended OPR's original proposal and issued Plaintiff a 33-day suspension and a demotion from a supervisory to a nonsupervisory position based on his repeated noncompliance with court orders in his child custody case. [DSMF ¶ 23].

Approximately four months later, on November 17, 2017, Judge #2 issued an order finding Plaintiff in contempt and sentenced Plaintiff to serve 60 days in jail. [DSMF ¶ 24]. In the order, Judge #2 found Plaintiff to be in civil contempt (twelve counts) and criminal contempt (four counts). [DSMF ¶ 25]. The four counts of criminal contempt were based on: (1) Plaintiff's failure to return his son after a visitation period and his continuing withholding of the son; (2) Plaintiff's refusal to return his daughter after a period of regular weekend visitation; (3) Plaintiff's denial of

6

his ex-wife's 2016 Mother's Day custody of their daughter and his removal of the daughter from the state without notice; and (4) Plaintiff's interference with his ex-wife's 2016 Thanksgiving access to their daughter and his removal of the daughter from the state without notice or consent. [DSMF ¶ 26]. The twelve civil contempt counts related to the financial aspects of the case, including Plaintiff's willful refusal to pay child support, alimony, fees, bills, property division, and interest on what he had previously been ordered to pay. [DSMF ¶ 27]. As to the twelve civil contempt counts, Judge #2 ordered that Plaintiff be incarcerated until he purged his contumacious conduct by making the required payments to the registry of the court. [DSMF ¶ 28]. As to the four criminal contempt counts, Judge #2 noted that he found Plaintiff's behavior to be "unconscionable, insupportable in law or fact, and morally indefensible," and ordered that Plaintiff be incarcerated for a total of 60 days, beginning on December 18, 2017. [DSMF ¶ 29]. In the order, Judge #2 noted that in 39 years of practicing law, he had "never before observed the wholesale disobedience and disregard for the orders of a court[,]" and that Plaintiff's behavior was made "particularly shocking and disheartening by virtue of his employment as a career federal law enforcement officer in the [FBI]." [DSMF ¶ 30].

Based on Judge #2's civil and criminal contempt findings, Plaintiff was arrested and spent one night in jail, after which time he paid the money and was released. [Pla.

7

Dep. at 16, 92; DSMF ¶ 31]. Plaintiff self-reported his arrest to the FBI and advised that he would be appealing Judge #2's order. [DSMF ¶ 32]. Plaintiff filed an appeal in early December 2017. [Pla. Dep. at 95-96; 140-41; DSMF ¶ 33]. Plaintiff stated: "The matter was remanded by the appellate court and was ultimately dismissed in August 2020. The appellate process did not leave Judge #2's order fully in place." [Pla. Dec. ¶ 20].

On December 5, 2017, a second OPR investigation was opened against Plaintiff based on Judge #2's November 2017 order. [Pla. Dep. at 101; DSMF ¶ 34]. Assistant Director Candace Will testified that on December 7, 2017, she summarily dismissed Plaintiff from the FBI. [Doc. 78-6, Will Declaration ("Will Dec.") at FBI001183, 1185–1186; DSMF ¶ 35]. The summary dismissal letter from Assistant Director Will to Plaintiff was dated December 7, 2017, and stated, in relevant part:

> I have completed my review of an administrative inquiry regarding the allegation that you willfully disobeyed numerous court orders and were held in contempt of court, in violation of Offense Code 5.21 (Unprofessional Conduct – Off Duty). Based on a preponderance of the evidence, I conclude the allegation is substantiated. . . . Your behavior dishonored and disgraced the FBI in your community and in the local courts, and seriously calls into question your judgment and character. . . . As a federal law enforcement officer, you swore to uphold, defend, and follow the law. You do not get to pick and choose the laws that you will and will not respect. Your conduct was repeated and, as a supervisor, you are held to a higher standard. Your actions tarnished the reputation of the FBI with the local court system, an important partner that is critical to the success of the mission of the FBI as a law enforcement organization. . . . You have shown through repetitive actions that you are unwilling or

8

unable to comply with both FBI standards and the law. . . . You were specifically put on notice that OPR expected you to comply with court orders. Your refusal to obey the court's orders, after being previously jailed for contempt, disciplined by OPR, and counseled by your supervisor, demonstrates that you refuse to conform to FBI standards of conduct. Since OPR's prior decision, your misconduct has escalated to the point where you are now being held in criminal contempt in addition to civil contempt. You have no potential for rehabilitation and your conduct deems you unfit for continued Bureau employment. Based on the circumstances of this case, I am summarily dismissing you for your 5.21 offense.

[DSMF ¶ 38; Doc. 78-8]. On December 13, 2017, ASAC Alcoke and SAC LeValley notified Plaintiff that he was being dismissed. [DSMF ¶ 42].

The FBI's summary dismissal process derives from a 1990s-era memorandum written by former FBI Director Louis Freeh (the "Freeh Memo"), which Assistant Director Will testified was the source of authority for summary dismissals. [Will Dep. at 9-10; PSMF ¶ 11]. According to Will, the Freeh Memo provides that authority for summary dismissal could not be delegated below the rank of Assistant Director. [Will Dep. at 15]. Will testified that summary dismissals are used in the most egregious cases when the facts are not in dispute and the matter is serious and compelling and will bring dishonor and discredit on the FBI. [Will Dep. at 12; DSMF ¶ 36]. Will also stated that deciding whether facts are "compelling" enough for summary dismissal is ultimately a "subjective determination." [PSMF ¶ 13].

Assistant Director Will testified that she used the summary dismissal process for Plaintiff because his conduct was serious, willful, repeated, and substantiated in the file. [Will Dep. at 65-66; DSMF ¶ 37]. Will also testified that OPR reviewed "276 cases" under Offense Code 5.21 (unprofessional conduct off duty) and concluded that summary dismissal for Plaintiff was consistent with "similar or same" offenses, but no specific comparator case details were identified in her letter or final analysis, and no documentation was made. [Will Dep. at 52-56; PSMF ¶ 22]. The data provided by the Agency demonstrates that, of the 14 FBI employees who were summarily dismissed in 2017, 50% of the employees summarily dismissed were white, while 50% were people of color. [PSMF ¶ 8].

Before Assistant Director Will issued the summary dismissal letter, the record indicated Plaintiff was actively appealing the November 17, 2017 contempt order. An FBI email from November 27, 2017 (which Will received) confirmed that Plaintiff was working on his appeal. [PSMF ¶ 16]. Will was asked and testified to the following:

> Q. Would you say that summary dismissal would be warranted even if he had appealed his decision?
>
> A. I would say that without having the benefit of the file to know all of the details that I knew at that time, which would certainly assist me, if a court has ordered certain action to take place and you thumb your nose at the court and you flout the court's orders, that's going to be a problem for the FBI. They are partners in the criminal justice process. . . . [T]here are proper ways to address grievances in the court system. . . . And if you do

not like the outcome, you don't get to pick and choose. . . ."

[Will Dep. at 32]. Will testified: "What I can say is that, generally speaking, summary dismissals are used in the most egregious cases when the facts are not in dispute and when the matter is serious and compelling and will bring dishonor and discredit on the organization." [Will Dep. at 12].

On January 15, 2018, Plaintiff filed a formal EEO Complaint of Discrimination (the "2018 EEO Complaint"). [Doc. 78-11, Exhibit I, 2018 EEO Complaint; DSMF ¶ 43]. In the 2018 EEO Complaint, Plaintiff alleged that he had been discriminated against based on his race and in retaliation for prior protected activity when the FBI summarily dismissed him from employment on December 13, 2017. [DSMF ¶ 44].

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of asserting the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required, however, to negate its opponent's claim; the movant may discharge its

11

burden by merely "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  After the movant has carried its burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law.  Id. at 248.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007)

12

(citing <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50. Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

## III. <u>DISCUSSION</u>

Plaintiff Hill's remaining claims are Title VII claims for race discrimination and retaliation based on his termination. [Docs. 29, 40, 47, 51]. Defendant has moved for summary judgment under Rule 56 on Plaintiff's claims based on the pleadings, statements of material facts, and exhibits submitted to the Court. [Doc. 78]. For the below reasons, the undersigned finds that Defendant's Motion for Summary Judgment [Doc. 78] should be granted in part and denied in part.

### A. <u>Title VII Race Discrimination Claim</u>

Title VII's federal-sector provision states: "All personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on race[.]" 42 U.S.C. § 2000e-16(a). The "'free from any discrimination' language means that personnel actions must be made in 'a way that is not tainted by differential treatment

based on' a protected characteristic." Babb v. Sec'y, Dep't of Veterans Affairs, 992 F.3d 1193, 1199 (11th Cir. 2021) ("Babb II") (quoting Babb v. Wilkie, 589 U.S. 399, 406 (2020) ("Babb I")); accord Buckley v. Sec'y of Army, 97 F.4th 784, 793 (11th Cir. 2024) (holding that "a federal employer violates the law if it allows race discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in race discrimination").

The Eleventh Circuit has held that the burden-shifting framework under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), no longer applies to federal-sector claims. See Terrell v. Sec'y, Dep't of Veterans Affairs, 98 F.4th 1343, 1352 (11th Cir. 2024), cert. denied sub nom. Terrell v. McDonough, No. 24-67, 2024 WL 4427203 (U.S. Oct. 7, 2024) ("As for Terrell's burden of proof, she is not bound by the McDonnell Douglas burden-shifting framework, as we no longer apply that framework for federal-sector claims."); Buckley, 97 F.4th at 794-95 ("[T]he burden under McDonnell Douglas is heavier than Title VII imposes on a plaintiff in a federal-sector case[.]"). Thus, if a plaintiff bringing a federal-sector discrimination claim is able to establish a *prima facie* case, the court will not apply "the second and third steps of [the McDonnell Douglas] framework," requiring "the defendant to articulate 'a legitimate, nondiscriminatory reason for its actions,'" and then requiring "the plaintiff to demonstrate that the 'proffered reason was merely a pretext for unlawful

14

discrimination[.]'" Lewis v. Sec'y of U.S. Air Force, No. 20-12463, 2022 WL 2377164, at *10 (11th Cir. June 30, 2022) ("Lewis II") (citations omitted). "But a federal sector employee alleging Title VII . . . claims must still establish a *prima facie* case that a decision was not 'made free from any discrimination[.]'" Lewis II, 2022 WL 2377164, at *10 (citation omitted).

"To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate that (1) [he] belongs to a protected class; (2) [he] was subjected to an adverse employment action; (3) [he] was qualified to perform the job in question; and (4) [his] employer treated similarly situated employees outside [his] class differently." Burke v. United States Postal Serv., No. 22-12488, 2023 WL 8841352, at *2 (11th Cir. Dec. 21, 2023); accord Lewis II, 2022 WL 2377164, at *10 (noting that "neither Babb I nor Babb II suggested that the comparator analysis in [Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019) ("Lewis I")] is inappropriate under the new standards"); Taylor v. Wormuth, No. 5:22-CV-01350-HNJ, 2024 WL 3333034, at *9 (N.D. Ala. July 8, 2024), appeal dismissed sub nom. Taylor v. Dep't of the Army, No. 24-12562-F, 2024 WL 4762925 (11th Cir. Sept. 18, 2024) ("Furthermore, after the Babb decisions other Eleventh Circuit and district court decisions, in cases involving federal-employee plaintiffs, evaluated comparator evidence pursuant to the prima facie case standard.") (citing, *inter alia*, Burke, 2023

15

WL 8841352, at \*2; <u>Troupe v. DeJoy</u>, 861 F. App'x 291, 294 (11th Cir. 2021) (per curiam)). "For comparators to be similarly situated, they do not have to be 'nearly identical,' but rather, 'similarly situated in all material respects.'" <u>Stimson v. Stryker Sales Corp.</u>, 835 F. App'x 993, 997 (11th Cir. 2020) (quoting <u>Lewis I</u>, 918 F.3d at 1218).

Plaintiff can establish the first element for his Title VII racially discriminatory termination claim because he is black. [DSMF ¶ 1]. Plaintiff is able to establish the third element because he was qualified for his job. Plaintiff worked for the FBI approximately twenty years as a Special Agent and a Supervisory Special Agent. [DSMF ¶¶ 1, 2]. Plaintiff can establish the second *prima facie* element because he was subjected to an adverse employment action when he was summarily dismissed from his employment in December 2017. [DSMF ¶¶ 35, 37, 38, 42].

The final *prima facie* element for Plaintiff's Title VII racially discriminatory termination claim requires him to show that Defendant treated him less favorably than a similarly situated individual outside his racially protected class. In support of his race discrimination claim, Plaintiff points to white FBI agents who allegedly engaged in serious off-duty offenses but were not summarily dismissed. [Doc. 79 at 9-11]. Plaintiff testified that one white agent (Comparator #1) "got drunk in a government car, ran over a motorcyclist, got arrested, convicted," and "didn't even get demoted." [Pla.

16

Dep. at 152-53]. According to Plaintiff, another white agent (Comparator #2) had "three DUI arrests, the third one resulting in jail time," but he "never lost his job." [Id. at 153]. Plaintiff testified that a third white agent (Comparator #3) "knocks out a minor, adolescent, in a domestic dispute" and "was convicted of assault," but "kept his job." [Id.]. Plaintiff also cited to a white agent (Comparator #4) who was not fired despite being "accused of murdering his wife" and "tried three times; acquitted all three times." [Id.]. Finally, Plaintiff testified that a white agent (Comparator #5) assaulted a handcuffed prisoner but was restored with full back pay. [Id. at 165]. Plaintiff identified the names of these individuals during his deposition. [Id. at 161-65]. The parties disagree about whether these "proffered comparators were 'similarly situated in all material respects.'" Lewis I, 918 F.3d at 1218.

The Eleventh Circuit has explained that ordinarily, a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff, . . . will have been subject to the same employment policy, guideline, or rule as the plaintiff, . . . will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, . . . and will share the plaintiff's employment or disciplinary history." Id. at 1227-28. "In short, as its label indicates–'all material respects'–a valid comparison will turn not on formal labels, but rather on substantive likenesses." Id. at 1228.

17

Defendant argues that the alleged comparators and Plaintiff are not similarly situated. [Doc. 78-1 at 13-14]. Defendant notes that Assistant Director Candace Will dismissed Plaintiff because he willfully and repeatedly disobeyed numerous court orders and was held in civil and criminal contempt by two different judges. [Id.]. Defendant contends that the alleged comparators are not similar to Plaintiff because there is no evidence that they refused to obey court orders, were disciplined by OPR for such refusal, or were counseled for such refusal. [Id.]. The Court finds this argument unpersuasive and concludes that Plaintiff has cited to evidence which would permit a reasonable jury to conclude that some of the identified individuals engaged in similar misconduct but were treated more favorably.

The FBI's summary dismissal process derives from the Freeh Memo, which Assistant Director Will testified was the source of authority for summary dismissals. [Will Dep. at 9-10; PSMF ¶ 11]. According to Will, the Freeh Memo provides that authority for summary dismissal could not be delegated below the rank of Assistant Director. [Will Dep. at 15]. Will testified that summary dismissals are used in the most egregious cases when the facts are not in dispute and the matter is serious and compelling and will bring dishonor and discredit on the FBI. [Will Dep. at 12; DSMF ¶ 36]. Plaintiff, as noted *supra*, testified that the identified comparators were all white FBI agents who presumably were under the same employment policies and rules.

Three of the comparators were convicted and/or served jail time but did not lose their jobs. Comparator #1 was a white agent who was arrested and convicted for drunk driving and hitting a motorcyclist, but was not dismissed from his job. [Pla. Dep. at 152-53]. Comparator #2 was a white agent who was arrested three times for DUI and served jail time for the last arrest, but he was not dismissed. [Id. at 153]. Comparator #3 was a white agent convicted of assaulting a minor during a domestic dispute, but he "kept his job." [Id.].

Defendant is correct that the comparators did not refuse to obey court orders. But as discussed previously, comparators "do not have to be nearly identical" to Plaintiff. Stimson, 835 F. App'x at 997 (citation and internal quotation marks omitted). And here, a reasonable jury could conclude that Comparators #1, #2, and #3 engaged in misconduct that was similarly egregious to Plaintiff's, if not more so. For these reasons, the undersigned concludes that a reasonable jury could find that Plaintiff has offered evidence that Defendant gave more favorable treatment to employees outside his racially protected class who were "similarly situated in all material respects." Id. (citation and internal quotation marks omitted). Plaintiff is therefore able to establish a *prima facie* case of race discrimination.

Because Plaintiff is bringing a Title VII federal-sector racially discriminatory termination claim, his ability to establish a *prima facie* case means the analysis ends

and he survives summary judgment. "[T]he fact that there may be non-pretextual reasons for an adverse employment action doesn't cancel out the presence, and the taint, of discriminatory reasons." Malone v. U.S. Attorney General, 858 F. App'x 296, 301 (11th Cir. 2021) (citation and internal quotation marks omitted). For these reasons, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 78] be **DENIED** on Plaintiff's Title VII racially discriminatory termination claim.

### B. Title VII Retaliation Claim

Plaintiff next alleges that Defendant subjected him to retaliation in violation of Title VII when it summarily dismissed him. As noted, Title VII's federal sector provision states that "[a]ll personnel actions affecting [federal] employees . . . shall be made free from any discrimination. . . ." 42 U.S.C. § 2000e-16(a). This provision does not explicitly prohibit retaliation, but the Eleventh Circuit has "held that retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)." Babb II, 992 F.3d at 1203.

"[I]f retaliation for engaging in a protected activity under Title VII taints the decision-making process for any personnel action, that violates the federal-sector provision—even if the employer would have made the same decision absent retaliation." Buckley, 97 F.4th at 798. "A plaintiff makes out a prima facie case of retaliation by showing that he: (1) engaged in statutorily protected activity; (2) suffered

20

an adverse employment action; and (3) established a causal link between the protected activity and the adverse action." Malone, 858 F. App'x at 303. Plaintiff is able to establish the second element because he was summarily dismissed from his employment with the FBI in December 2017. [DSMF ¶¶ 35, 38, 42]. Plaintiff is able to establish the first *prima facie* element because he filed an EEO Complaint in 2014 or 2015, and he filed another EEO Complaint on October 10, 2016. [PSMF ¶ 1; DSMF ¶ 14]. In the 2016 EEO Complaint, Plaintiff alleged race discrimination and retaliation based on, *inter alia*: (1) his non-selection for an ASAC position in June 2016; (2) his transfer to a less prestigious squad in June 2016; and (3) various performance-related issues. [DSMF ¶ 15].

The final *prima facie* element requires Plaintiff to show that there was a causal connection between the statutorily protected expression and the adverse employment action. See Malone, 858 F. App'x at 303. "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." Patterson v. Georgia Pac., LLC, 38 F.4th 1336, 1351 (11th Cir. 2022) (citation and internal quotation marks omitted). The decisionmaker's awareness of the plaintiff's protected activity "can be established through circumstantial evidence—but not by unsupported inference." Martin v. Financial Asset Mgmt. Sys., Inc., 959 F.3d 1048,

21

1053 (11th Cir. 2020). Here, Plaintiff is able to show that the decisionmaker was aware of his protected expression. The person who made the decision to summarily dismiss Plaintiff from his employment was Assistant Director Candice Will. [DSMF ¶¶ 35, 38]. Will learned of Plaintiff's EEO Complaint during a meeting on July 11, 2017. [DSMF ¶ 18; PSMF ¶ 3; Pla. Dep. at 104-05]. At that time, Plaintiff informed Will that "there was an EEO Complaint." [PSMF ¶ 3; Pla. Dep. at 104-05].

The next issue the Court must determine is whether Plaintiff is able to show a causal connection between the adverse action and the decisionmaker's awareness of Plaintiff's EEO Complaint. If an employer takes an adverse employment action against an employee shortly after the decisionmaker learns of the employee's protected expression, then the close temporal proximity between the two events is sufficient to meet the causation requirement. See Adams v. City of Montgomery, 569 F. App'x 769, 773 (11th Cir. 2014). The Supreme Court has held that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close[.]'" Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001).

The Court finds that Plaintiff has failed to establish a causal connection. As noted, Assistant Director Will became aware of Plaintiff's protected activity during a meeting with Plaintiff on July 11, 2017. [DSMF ¶ 18; PSMF ¶ 3; Pla. Dep. at 104-05].

22

A second OPR investigation was opened against Plaintiff on December 5, 2017, based on an order issued by Judge #2 in November 2017. [Pla. Dep. at 101; DSMF ¶ 34]. Two days later, on December 7, 2017, Will made the decision to summarily terminate Plaintiff's employment. [DSMF ¶ 35, 38; Doc. 78-8; Will Dec. at FMI001183, 1185-1186]. This means there was a lapse of approximately five months between the time Will learned of Plaintiff's EEO Complaint and the summary dismissal.

The Eleventh Circuit has noted that the Supreme Court in Breeden "cited with approval decisions in which a three to four-month disparity was found to be insufficient to show causal connection." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). In Thomas v. Cooper Lighting, Inc., 506 F.3d 1361 (11th Cir. 2007), the Eleventh Circuit held that a three-month gap "does not rise to the level of 'very close.'" Id. at 1364.[1] Here, the gap of approximately five months between the time Assistant Director

---

[1] It is not clear that a gap even as close as two months is sufficient to establish a causal link. In Jacomb v. BBVA Compass Bank, 791 F. App'x 120, 124 (11th Cir. 2019), the Eleventh Circuit wrote that "our case law addressing causation between events that are two months apart consists solely of unpublished opinions with mixed outcomes." The Jacomb Court noted that in Embry v. Callahan Eye Foundation Hospital, 147 F. App'x 819, 831-32 (11th Cir. 2005), the Court assumed without deciding that two months satisfied the causal connection requirement. See Jacomb, 791 F. App'x at 124. But the Jacomb Court noted that in Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 229-30 (11th Cir. 2011), the Eleventh Circuit found that a two-month gap was not "very close" and could not establish causation. Id.

Will learned of Plaintiff's EEO Complaint and the summary dismissal is not sufficiently close to establish a causal connection.

Plaintiff argues that a reasonable jury could find that Will was motivated by retaliatory animus because she could not recall her conversation with Plaintiff when he informed her in July 2017 that he had an outstanding EEO Complaint. [Doc. 79 at 17]. Plaintiff writes, "The jury could find it suspicious, even mendacious, that Ms. Will denies recalling the EEO matter—especially given the significance of an OPR hearing at which Hill was explicitly raising EEO concerns." [Id.]. The Court finds this argument lacking. Defendant acknowledges that during the July 2017 meeting, Plaintiff and his attorney notified Will of Plaintiff's 2016 EEO Complaint. [DSMF ¶ 22]. The fact that Will testified in late 2024 that she could not recall details from a conversation in July 2017 would not permit a reasonable jury to find that Will was motivated by retaliatory animus or that there was a causal connection between Will's awareness of Plaintiff's protected activity and the summary dismissal.

Plaintiff also argues that a jury could find retaliation because Will admitted that summary dismissal is designed for the "most egregious" offenses. [Doc. 79 at 18]. According to Plaintiff, his off-duty misconduct fell far short of this. [Id.]. Plaintiff contends that he "was appealing the contempt findings that supposedly supported his termination. Rather than waiting for the appellate court, which might vacate or reverse

24

the orders, the FBI invoked summary dismissal immediately." [Id.]. Plaintiff's arguments on this issue are unpersuasive.[2]

The record reveals that on November 17, 2017, about three weeks before Plaintiff was summarily dismissed, he was found in contempt and sentenced to serve 60 days in jail. [DSMF ¶ 24]. In the order issued by Judge #2, Plaintiff was found to be in civil contempt (twelve counts) and criminal contempt (four counts). [DSMF ¶ 25]. As to the twelve civil contempt counts, Judge #2 ordered that Plaintiff be incarcerated until he purged his contumacious conduct by making the required payments to the registry of the court. [DSMF ¶ 28]. As to the four criminal contempt counts, Judge #2 noted that he found Plaintiff's behavior to be "unconscionable, insupportable in law or fact, and morally indefensible," and ordered that Plaintiff be incarcerated for a total of 60 days, beginning on December 18, 2017. [DSMF ¶ 29]. In the order, Judge #2 noted that in 39 years of practicing law, he had "never before observed the wholesale disobedience and disregard for the orders of a court[,]" and that Plaintiff's behavior was made "particularly shocking and disheartening by virtue of his

---

[2] Plaintiff also cites to white FBI agents who engaged in similar misconduct but were allegedly treated more favorably. [Doc. 79 at 19]. As discussed *supra*, the Court has found that Plaintiff's race discrimination claim survives summary judgment. But Plaintiff's comparator arguments are not relevant to his retaliation claim and will not be addressed further.

employment as a career federal law enforcement officer in the [FBI]." [DSMF ¶ 30]. Based on Judge #2's civil and criminal contempt findings, Plaintiff was arrested and spent one night in jail, after which time he paid the money and was released. [Pla. Dep. at 16, 92; DSMF ¶ 31]. Plaintiff self-reported his arrest to the FBI and advised that he would be appealing Judge #2's order. [DSMF ¶ 32]. Despite Plaintiff's arguments to the contrary, these facts would not permit a reasonable jury to conclude that Assistant Director Will's decision to summarily dismiss Plaintiff a few weeks later was motivated by retaliatory animus.

In sum, the Court finds that Plaintiff has failed to establish a causal connection in support of his retaliation claims. Plaintiff has not cited to evidence which would permit a reasonable jury to find that the decisionmaker, Assistant Director Will, was motivated by retaliatory animus when she made the decision to summarily dismiss Plaintiff from his employment with the FBI. Therefore, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 78] be **GRANTED** on Plaintiff's Title VII retaliatory termination claim.

## IV. <u>CONCLUSION</u>

Based on the foregoing reasons and cited authority, the Court **RECOMMENDS** that Defendant's Motion [Doc. 78] for Summary Judgment be **GRANTED** on Plaintiff's Title VII retaliatory termination claim but **DENIED** on Plaintiff's Title VII

racially discriminatory termination claim.

As this is a Final Report and Recommendation and there are no other matters pending before this Court, the Clerk is **DIRECTED** to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this _7_ day of February, 2025.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE